## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

|  |  |  |
|---|---|---|
| IN RE CATERPILLAR INC. | ) | |
| SHAREHOLDER DERIVATIVE | ) | |
| LITIGATION | ) | Master Docket No. 1:13-cv-01104-SLD-JEH |
| | ) | |
| | ) | |
| This Document Relates to: ALL ACTIONS | ) | |

<u>ORDER</u>

This suit arises from the acquisition of ERA Mining Machinery, Ltd ("ERA"), a Chinese

mining equipment company, and its wholly owned subsidiary Zhengzhou Siwei Mechanical &

Electrical Manufacturing Co., Ltd. ("Siwei") by Caterpillar, Inc. ("Caterpillar") in June 2012.

On November 12, 2015, Plaintiffs Iron Workers Mid-South Pension Fund ("Iron Workers"), City

of Sterling Heights General Employees' Retirement System ("Sterling Heights"), Michel D.

Wolin, and The Ellen J. Stokar IRA ("Stokar IRA") filed an amended consolidated derivative

complaint, ECF No. 87, alleging breach of fiduciary duties and corporate waste by Caterpillar's

current and former directors.

At issue are Defendant's Motion to Dismiss the Amended Consolidated Complaint, ECF

No. 90, Plaintiffs' Motion for Leave to File Under Seal, ECF No. 92, and Plaintiffs' Motion to

Strike Defendants' Exhibits A, G, and I and Additional Purported Facts Not Alleged in the

Complaint, ECF No. 95. For the reasons set forth below, Defendants' Motion to Dismiss is

GRANTED. Plaintiffs' Motion to Strike is DENIED. Lastly, Plaintiffs' Motion for Leave to File

Under Seal, ECF No. 92, is DENIED.[1]

---

[1] The Court recognizes that Plaintiffs seek to file under seal to meet the terms of the Confidentiality and Non-Disclosure Agreement they have signed with Defendants, ECF No. 92, Ex. A. The Court notes that it is not bound by that agreement. The Seventh Circuit strongly adheres to the precept that "[d]ocuments [affecting] the disposition of federal litigation are presumptively open to public view." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). Defendants have not moved to show cause as to why any documents or materials relied on in the Court's Order

# BACKGROUND[2]

## I.    The Defendants

### a.  Nominal Defendant Caterpillar

Caterpillar (or "Company"), a publicly traded Delaware corporation with its principal executive offices located in Peoria, Illinois, is a manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives.

### b.  Director and Officer Defendants

The operative pleading in this case names seventeen individual defendants: Douglas R. Oberhelman, Edward J. Rapp, Edward B. Rust, Jr., William A. Osborn, Daniel M. Dickinson, Jesse J. Greene, Jr., Dennis A. Muilenburg, Juan Gallardo, Susan C. Schwab, Miles D. White, David L. Calhoun, Jon M. Huntsman, Jr., Eugene V. Fife, David R. Goode, Peter A. Magowan, Charles D. Powell, and Joshua I. Smith.  Oberhelman has served as Caterpillar's chief executive officer since July 2010 and as its chairman since November 2010.  Rapp served as a group president and chief financial officer of Caterpillar from June 2010 until January 2013; he served as Caterpillar's Group President, Resource Industries, until retiring in 2016, and was a member

---

should be sealed, nor have they filed any sealed or redacted briefing themselves.  The materials originally filed under seal by Plaintiffs—the Amended Consolidated Complaint and the Plaintiffs' Memorandum in Opposition to the Motion to Dismiss—clearly "influence or underpin the judicial decision," in that they lay the legal and factual basis for the claim.  *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002).  Since the Court, in its own review of the unredacted filings, has identified none of the narrow exceptions to the presumption of openness, such as trade secrets or a compelling need for personal privacy, *id.*, the Amended Complaint and the Plaintiffs' Opposition will be filed publicly with the Order.

[2]  At the motion to dismiss stage of litigation, a district court must assume the truth of the complaint's well-pleaded factual allegations, though not its legal conclusions.  *Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012).  Besides the complaint itself, a motion to dismiss may be based on "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in the plaintiff's brief opposition dismissal, so long as those facts "are consistent with the pleadings."  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).  Accordingly, the facts set forth below are stated as favorably to Plaintiffs as permitted by the amended complaint and the other materials just mentioned, with all reasonable inferences drawn in Plaintiffs' favor.  *See Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 729 (7th Cir. 2012).

of Caterpillar's executive office since 2007.  The remaining fifteen defendants—Rust, Osborn, Dickinson, Greene, Muilenburg, Gallardo, Schwab, White, Calhoun, Huntsman, Fife, Goode, Magowan, Powell, and Smith—were directors of Caterpillar when the challenged transaction was approved in April 2012, and when the tender offer was finalized in June 2012. Plaintiffs do not allege that any of these fifteen defendants had or has any connection to Caterpillar or any of its employees other than his service on the board.

## II.    Caterpillar's Acquisition of ERA and Siwei

Prior to its acquisition by Caterpillar in June 2012, ERA designed, manufactured, sold, and supported underground coal mining equipment in China through its wholly-owned subsidiary, Siwei.[3]

### a.    Pre-Acquisition Insider Loans and Transfers of Assets

In April 2010, two of Siwei's directors, Emory Williams and Li Rubo, lent Siwei $6.4 million to pay down nearly $20 million in loans.  The loan was made at an interest rate of 8 percent a year, compounded annually.  Siwei's loans with commercial banks at that time had interest rates between 4.9 and 7.4 percent.  Previously, Williams and Li had helped finance ERA's purchase of Siwei in 2007 with a $2.95 million interest-free loan.  Li funded his portion of the $2.95 million loan by borrowing from another company of which he and Williams were also directors.  Both of these loans were fully disclosed in publicly available regulatory filings prior to Caterpillar's acquisition of Siwei.

Siwei's regulatory filings from around this same time show additional transfers of assets between Siwei and related companies.  In one instance, Siwei off-loaded an industrial tank manufacturing business, valued at nearly $5 million, to a company of which a Siwei director and

---

[3] For ease of reference and unless otherwise noted, the Court will use "Siwei" throughout to mean the holding company, ERA, as well as its operating subsidiary, Siwei.

former substantial shareholder had taken majority stake four months earlier for "nil consideration."  Siwei's regulatory filings identify the assets as loss-making; Siwei, however, continued to purchase equipment and services from the new company, at times paying above market rate.  In another instance, Siwei transferred a 7.5 percent stake in a mining equipment firm to one of its partners to offset "trade payables" (*i.e.*, liabilities owed to a supplier).

### b.  The October 12, 2011 Meeting[4]

Caterpillar's board of directors first considered purchasing Siwei at its October 12, 2011 meeting.  At that meeting, Steve Wunning, who was then the president of Caterpillar's mining equipment division, made a presentation to the board regarding Siwei and how its acquisition promoted the Company's interests and objectives.  The presentation included information about: China's mid-tier underground mining equipment market, which consisted of state-owned enterprises and three investor-owned companies (one of which was Siwei); various competitive considerations, including that one of the Company's competitors was in the process of acquiring one of these three investor-owned mid-tier underground mining equipment companies; Siwei, including its history, facilities, products, customer base, management, and ownership structure; and alternatives to an acquisition of Siwei, including other external and organic growth options. Wunning also discussed the potential purchase price, synergy range, valuation, status of negotiations, and a timeline for completing the acquisition.  The timeline contemplated finalizing due diligence by the end of October and obtaining the board's approval of the transaction in early November.

During Wunning's presentation, members of the board asked Wunning questions relating to the potential acquisition of Siwei, including questions about the market, competition, and Siwei's management and ownership.

---

[4] Huntsman did not attend the October 12 meeting; he did not join Caterpillar's board until April 2012.

c.  **The November 7, 2011 Meeting**[5]

The board next considered the Siwei acquisition at a special telephonic meeting held on November 7, 2011, during which Wunning presented on the basis for the proposed purchase price of Siwei and the terms of the Company's proposed cash tender offer.  The proposed offer included an "earn out" feature, intended at least in part to reduce the risk associated with the acquisition, with the payout to be based on Siwei's 2012 and 2013 financial performance and payable in 2013 and 2014.  The Company planned to require Siwei's principal shareholders to accept the earn out for at least 30 percent of their shares, and expected that 25 percent of Siwei's overall shares would be purchased as earn out shares.  Wunning informed the board that Caterpillar would provide Siwei with a $50 million working capital loan (or bridge loan) contemporaneously with the tender offer.

Wunning also presented on "matters of concern that had been identified during due diligence and the manner in which the Company proposed to resolve the outstanding issues." Nov. 7, 2011 Bd. Mtg Min. 2, Am. Compl. Ex. B, ECF No. 87-2.  These "matters of concern" included: (1) the age of Siwei's accounts receivable—on average, 320 days old; (2) unresolved land use rights and operating permits; (3) outstanding overtime payments—requiring a catch-up payment of up to $20 million; and (4) the need to make improvements to certain facilities.  Exec. Sum. 11, Am. Compl. Ex. B, ECF No. 87-2.  The Company proposed to resolve these issues by negotiating a lower acquisition price.

During the November 7, 2011 meeting, members of the board discussed and questioned Wunning about the need for a bridge loan, regulatory approvals, cash flow projections, major sources of projected synergies, the background of Siwei's principal owners, the purchase price premium, receivables aging, retention of key employees, and the projected rate of return, among

---

[5] Huntsman, Magowan, Goode, and Powell did not attend the November 7 meeting.

other things.  At the conclusion of the meeting, the board resolved to approve the Siwei acquisition, including the $50 million bridge loan.

On November 10, 2011, Caterpillar announced that it had made a pre-conditional voluntary offer for all of Siwei's issued shares.  The preliminary purchase price was approximately $690 million—a 33 percent premium above Siwei's pre-acquisition stock price. This price consisted of $233 million in net assets and $467 million in goodwill.

### d.  The April 11, 2012 Meeting

Wunning provided the board with an update on the Siwei acquisition prior to the board's April 11, 2012 meeting.  Siwei had reported a $2 million loss for 2011, compared to its earlier forecast of $16 million in profits.  Siwei's accounts receivable had also increased from, on average, 320 days outstanding to 371 days outstanding.

The board discussed the earnings shortfall with Wunning at the April 11, 2012 board meeting, and was advised that the acquisition was still considered "strategically attractive" despite the shortfall.  The meeting minutes do not show that the board discussed or questioned Wunning about whether the Company should proceed with the Siwei acquisition or attempt to reduce the purchase price.

Caterpillar completed its tender offer on June 6, 2012.  The Company's quarterly report on Form 10-Q, filed with the Securities and Exchange Commission ("SEC") on August 6, 2012, reports that the final purchase price was $671 million, consisting of $194 million in net assets and $476 million in goodwill.  In its annual report on Form 10-K, filed with the SEC on February 19, 2013, Caterpillar adjusted the purchase price to $677 million, and increased the goodwill associated with the transaction to $625 million.

### e.  Siwei's Accounting Fraud

Several months after Caterpillar acquired Siwei, in November 2012, Caterpillar announced that it had identified discrepancies between the inventory recorded in Siwei's accounting records and its actual physical inventory during an inventory check at Siwei's facilities, and was launching an internal investigation into Siwei.  On January 18, 2013, Caterpillar issued a press release announcing that this internal investigation into Siwei had uncovered "deliberate, multi-year, coordinated accounting misconduct concealed at Siwei" designed to overstate the profitability of Siwei's business.  Specifically, Caterpillar's internal investigation identified inappropriate accounting practices involving improper cost allocation that resulted in overstated profit, as well as improper revenue recognition practices involving early and, at times, unsupported revenue recognition.  As a result of this misconduct, Caterpillar reported a non-cash goodwill impairment charge of $580 million (or $0.87 per share) in the fourth quarter of 2012.

In a *Reuters* article published on January 23, 2014, Siwei's former CEO Wang Fu contested Caterpillar's accounting fraud allegations, claiming that Siwei's accounting problems were the product of an inexperienced finance team and bad accounting methodology.  Wang also claimed that he raised these accounting problems "two or three times at Siwei board meetings," Am. Compl. ¶ 84, ECF No. 87, and that the problems were "an easily discovered management issue," *id*.  The *Reuters* article also reports Wang as saying that "nobody knew exactly how bad things were" until October 2012, when he "mobilized employees in finance, sales, manufacturing and technology to dig into accounting issues following the acquisition." *Id*.

Following the internal investigation, Caterpillar removed several senior managers at Siwei who were responsible for the misconduct, and put into place a new leadership team.  The

7

Company also pursued claims against former principals of Siwei, and, on May 16, 2013, announced that a settlement had been reached.  Under the terms of the settlement, Caterpillar's obligation under the earn-out provision was reduced by $135 million.

### f.   The Current Litigation

Shortly after Caterpillar announced the $580 million impairment charge, in March 2013, the first of four shareholder derivative lawsuits was filed in this Court.  These lawsuits were consolidated, and on January 9, 2015, Plaintiffs collectively filed a consolidated complaint, ECF No. 60, asserting four causes of action: (1) breach of fiduciary duty, (2) corporate waste, (3) unjust enrichment, and (4) aiding and abetting breach of fiduciary duty. Plaintiffs alleged that Defendants, privy to adverse, non-public information about the true value of Siwei, "unreasonably caused Caterpillar to acquire Siwei for an excessively high price thereby causing significant and ongoing damage to the Company."  Cons. Compl.  ¶ 72, ECF No. 60.  Prior to that filing, Plaintiffs did not make any demand on Caterpillar's board of directors to institute an action against themselves, stating that such demand would have been futile.

On September 28, 2015, Plaintiffs' complaint was dismissed without prejudice.  Sept. 28, 2015 Order 16, ECF No. 84.  This Court found that the initial complaint did not adequately plead demand futility because "Plaintiff's allegations fail[ed] to create a reasonable doubt that either the board's approval of the Siwei acquisition or the board's 'failure' to stop or otherwise modify the transaction after approval but before closing was not a valid exercise of business judgment." *Id.*  In Plaintiffs' own exhibits, the Court found that the Caterpillar board had completed a "thorough, well executed" due diligence process, *id.*, and had not consciously abdicated its responsibilities in bad faith. *Id.* at 17.  Plaintiffs did not allege that Defendants had made an "intentional decision to ignore legal obligations of the Company," Sept. 28, 2015 Order 18, and

the Court found that Plaintiff's allegations showed no more than that the Board "did not make a prudent judgment about the possibility of Siwei's future success[.]" *Id.* at 16.  The Court similarly found that the claim of corporate waste was not supported by particularized facts to show that the Board's decision to complete the Acquisition was egregious or irrational. *Id.* at 18. On November 12, 2015, Plaintiffs filed an Amended Consolidated Complaint, ECF. No. 87, maintaining all causes of action but the unjust enrichment claim.

The Amended Consolidated Complaint, identically to the previously dismissed complaint, points to five types of accounting problems that, according to Plaintiffs, indicated that the $677 million price Caterpillar paid for Siwei was "untenable." Am. Compl. ¶ 48.  These accounting problems include: "(i) Siwei's barely profitable operations and problems collecting payment from customers; (ii) Siwei's need for an immediate $50 million bridge loan; (iii) Siwei's escalating accounts receivable problems; (iv) the enormous amount of goodwill Caterpillar was forced to book as part of the Siwei acquisition; and (v) Siwei being involved in a web of insider loans and asset shuffling prior to its purchase by Caterpillar." *Id.* at. ¶ 53. Plaintiffs allege that Defendants purposefully ignored the accounting problems at Siwei, which caused Caterpillar to go through with an ill-informed transaction, followed by attempts to make false statements "to cover up the defendants' fiduciary failures." *Id*. ¶ 46.

In support of their claims against Defendants, Plaintiffs renew their allegations that Defendants had a fiduciary duty to consider all reasonably available information before purchasing Siwei, and "to question the Siwei acquisition, to ensure it was in the best interests of the Company, and to act as a check on the ambitions of the Company's executives seeking to expand into China as rapidly as possible." *Id*. ¶ 87.  Plaintiffs further allege that Defendants breached those duties and wasted corporate assets when they "cause[d] Caterpillar to close the

Siwei acquisition in the face of . . . significant and escalating accounting problems," causing "significant" damage to the Company.  *Id.*

To bolster their original complaint, Plaintiffs provide, as evidence of "motive," Pls.' Mem. Opp. 2, ECF No. 94, more information about Caterpillar's desire to aggressively expand its presence into the Chinese coal-mining market. Am. Compl. ¶¶ 1–2.  Next, Plaintiffs allege that the Board ignored guidance from the SEC warning of the risk of fraudulent transactions with Chinese companies.  *Id.* ¶¶ 88–9. Plaintiffs allege that the Caterpillar board, acting with only the veneer of process, "blindly rel[ied]" on information presented by Wunning and Oberhelman, rather than challenging or slowing what appeared to be a troubled transaction. *Id.* ¶ 35. Additionally, Plaintiffs contend that the Board's failure to "ask specific questions" or consider alternatives to completing the transaction were indicia of the directors' bad faith. *Id.* ¶ 91.  They argue that the "only logical conclusion" to be drawn from the evidence is that the Board "simply did not care if the decision[] caused [Caterpillar] and its stockholders to suffer injury or loss. Pls.' Mem. Opp. 12.

In support of their motion to dismiss the complaint, Defendants argue that Plaintiffs have simply rehashed the same core factual allegations which this Court previously rejected in its first dismissal. Defs.' Mem. Supp. Mot. Dismiss, ECF No. 91.  Defendants make a twofold argument: first, that none of the above supposed "red flags"—the accounts receivable issues, the need for a bridge loan, the self-interested sales of assets by Siwei's directors—were enough to indicate to the Board the extent of the Siwei's underlying accounting problems, *id.*, and, regardless, that the directors considered each of these problems and came to a good faith decision to proceed with the Acquisition.  *Id.* at 18.

## DISCUSSION

### I.      Legal Standards

The derivative suit is a tool by which a shareholder seeks to enforce the corporation's right against its own directors' "misfeasance and malfeasance."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991).  Because "'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors."  *In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 803 (7th Cir. 2003) (quoting *Kamen*, 500 U.S. at 101).

Federal Rule of Civil Procedure 23.1(b), which establishes the pleading requirements for shareholder derivative actions proceeding in federal court, provides that a derivative complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P 23.1(b)(3).  Pleading with particularity means that a plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story."  *McSparran v. Larson*, No. 04 C 0041, 2007 WL 684123, at *3 (N.D. Ill. Feb. 28, 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *see also Marvin H. Maurras Revocable Trust v. Bronfman*, Nos. 12 C 3395, 12 C 6019, 2013 WL 5348357, at *9 (N.D. Ill. Sept. 24, 2013) ("Because Rule 23.1 requires particularized allegations, the pleading standard is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6)." (quoting *In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006)).

But while Rule 23.1(b) governs "the degree of detail that the plaintiff must furnish when it gives its 'reasons for not obtaining the action or not making the effort,'" *Westmoreland*, 727 F.3d at 722 (quoting Fed. R. Civ. P. 23.1(b)(3)(B)), whether those reasons are legally sufficient to permit the shareholder to proceed with the litigation depends on state substantive law, *id.* at 725; *see also In re Abbott Labs. Derivative Litig.*, 325 F.3d 795, 804 (7th Cir. 2003) ("[T]he requirement of a shareholder demand is more than a pleading requirement, it is a substantive right of the shareholder and the directors.  It is the law of the state of incorporation which controls these substantive rights and governs what excuses are adequate for failure to make demand." (internal citation omitted)).

In this case, because Caterpillar is incorporated in Delaware, Delaware substantive law determines whether Plaintiffs have established demand futility and are therefore permitted to litigate derivatively on Caterpillar's behalf.

### a.  *Aronson* Test

Where a derivative suit challenges a decision of the board of directors, as the instant action does, Delaware courts apply the test set forth by the Delaware Supreme Court in *Aronson* to determine whether a pre-suit demand would have been futile and is therefore excused.  *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).  The *Aronson* test provides that individual shareholders, like Plaintiffs here, must make a pre-suit demand on the board of directors, unless "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); *see also id.* at 812 (explaining that "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability").  The *Aronson* test is "in

the disjunctive[:] if either prong is satisfied, demand is excused." *Westmoreland*, 727 F.3d at 725 (quoting *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000)).

The business judgment rule establishes "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Westmoreland*, 727 F.3d at 725 (quoting *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009)).  In the context of demand futility, the burden is on the plaintiff in a derivative suit to overcome that presumption.  *Beam v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004).  The rule is "an acknowledgment of the managerial prerogatives of Delaware directors," *Aronson*, 473 A.2d at 812, and that these directors "ordinarily enjoy wide latitude in managing a corporation's affairs," *Westmoreland*, 727 F.3d at 725 (citing *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (emphasizing that "wrong" or "stupid" board decisions generally "provide[] no ground for director liability")).

Plaintiffs in this case contend that their amended complaint "demonstrates reason to doubt that the acquisition of Siwei was a valid exercise of business judgment," and that their failure to make a pre-suit demand is therefore excused under *Aronson*'s second prong.  Pls.' Mem. Opp. 3.  For the following reasons, the Court disagrees.

## II.     Demand Futility

Broadly at issue is whether Plaintiffs were excused from making a pre-suit demand on Caterpillar's board of directors before initiating the current shareholder suit. Caterpillar has insulated its officers and directors from liability for breach of fiduciary duty in cases of negligence and gross negligence via a commonly used exculpatory provision available under Delaware law.  Defs.' Mem. Supp. Mot. Dismiss, Ex. K. Restated Certificate of Incorporation of Caterpillar Inc., Quarterly Report (Form 10-Q).  *See* Del. C. § 102(b)(7). Pursuant to that

provision, Caterpillar's directors may only face liability for claims involving breach of the duty of loyalty, actions taken in bad faith, and intentional misconduct or knowing violation of law. *See* Defs.' Mem. Supp. Mot. Dismiss, Ex. K. Plaintiffs are left only with those options as a basis for filing suit, and so contend that the Caterpillar board breached their duties of loyalty and good faith by allowing Caterpillar to acquire Siwei. Am. Compl. ¶ 42.

### A. Duty of Loyalty Claim

The duty of loyalty is a fiduciary duty encompassing the director's responsibility to act with the "good faith belief that her actions are in the corporation's best interests." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del.Ch.2003)). The duty of loyalty is most commonly breached when a director places his financial interests before the company's, but it can also be breached by misconduct that is "qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care." Westmoreland, 727 F.3d at 725 (quoting Stone, 911 A.2d at 367). Where directors are exculpated from gross negligence claims pursuant to a §102(b)(7) clause, the facts pled by plaintiffs must show that directors "breached their duty of loyalty by somehow acting in bad faith for reasons inimical to the best interests" of stockholders. *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 648 (Del. Ch. 2008). Specifically, directors must demonstrate a "conscious disregard for their responsibilities" or an "intentional dereliction of duty" constituting bad faith conduct. *Westmoreland*, 727 F.3d at 726 (internal quotation marks omitted). "[P]urposeful wrongdoing" is a hallmark of a breach of the duty of loyalty under Delaware law. *See Lear*, 967 A.2d at 653.

This Court previously noted in its Order dismissing the initial complaint, Sept. 28, 2015 Order 16, that a very "extreme set of facts would seem to be required to sustain a disloyalty

claim premised on the notion that disinterested directors were intentionally disregarding their duties." *Lear*, 967 A.2d at 654–55. A plaintiff would need to show that the defendants "completely and utterly failed to even attempt to meet their duties." *In re Dow Chem. Co. Derivative Litig.*, 4349-CC, 2010 WL 66769, at *10 (Del. Ch. Jan. 11, 2010).

A breach of the duty to act in good faith does not directly result in liability, as it does not stand on the same footing as the duty of care or the duty of loyalty; however, conduct evincing a lack of good faith is a subsidiary element of the duty of loyalty, and can "indirectly" result in liability. *Stone*, 911 A.2d at 369–70.

### a. Analysis

Plaintiffs have not added new factual information sufficient to alter the analysis in the Court's previous Order. Shareholder plaintiffs may not challenge the substance of a business decision under the business judgment rule, barring a decision that is so irrational it pushes the "outer limits" of the rule's protections. *Brehm*, 746 A.2d at 264 (explaining that irrationality may be a proxy for bad faith); *see also In re Biglari Holdings, Inc. S'holder Derivative Litig.*, 93 F. Supp. 3d 936, 951 (S.D. Ind. 2015), *aff'd, In re Biglari Holdings, Inc.*, 813 F.3d 648 (7th Cir. 2016) ("[T]he decision approving the challenged transaction must be so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (internal quotation marks omitted)).

Since courts cannot be in the business of making cost-benefit calculations for corporations, their analysis must focus on "*process* due care only." *Brehm*, 746 A.2d at 264. Here, Plaintiffs attempt to evade this familiar standard by arguing that "blindly jumping through hoops of a so-called 'process' but ignoring the facts revealed during the 'process'" is not a protected business judgment. Am. Compl. ¶ 6. Implicit in this allegation (and corroborated by

Plaintiffs' own admissions to the Court, Am. Compl. ¶¶ 49-50; 52) is that Defendants did, in

fact, observe a standard diligence process. The core of Plaintiffs' argument revolves around the

same set of "red flags" to which Plaintiffs' previously drew the Court's attention:

> "(i) Siwei's barely profitable operations and problems collecting payment from
> customers; (ii) Siwei's need for an immediate $50 million bridge loan; (iii) Siwei's
> escalating accounts receivable problems; (iv) the enormous amount of goodwill
> Caterpillar was forced to book as part of the Siwei Acquisition; and (v) Siwei being
> involved in a web of insider loans and asset shuffling prior to its purchase by
> Caterpillar."

Am. Compl. ¶ 53; *see* Consol. Compl. ¶ 75, ECF No. 60.  Plaintiffs do not allege that

Defendants ignored these problems, and, in fact, allege that they were uncovered and discussed

during Caterpillar's due diligence process, Am. Compl. ¶¶ 73-74.  Plaintiffs simply disapprove

of the risk calculus used by the Board in choosing to complete what they consider an

"unreasonable" acquisition.  Am. Compl. ¶ 6. This formulation of Plaintiffs' argument is another

iteration of the one this Court already deemed insufficient in the first complaint: "Plaintiffs'

claims against Defendants boil down to the argument that, in hindsight, Caterpillar's board did

not make a prudent judgment about the possibility of Siwei's future success, and ended up

overpaying for Siwei."  Order 16.

The exhibits presented by Plaintiffs indicate that the Board not only was presented with

these risks, but proactively analyzed them. The minutes from the hour-long meeting on

November 7, 2011 indicates that the Board members were concerned about, and did address, a

broad array of the concerns Plaintiffs allege were not thoroughly considered: namely, "the need

for a bridge loan, Siwei's government relations, regulatory approvals, cash flow projections . . . ,

whether the Company should retain a public entity in China, . . . , the background of Siwei's

principal owners, the purchase price premium, receivables aging, retention of key employees and

the projected rate of return."  Nov. 7, 2011 Bd. Mtg Min. 2 Notably, the talking points for the

presentation to the Board included objectives that suggest thoughtful consideration of the risks at hand (identified as "issues common to Chinese acquisitions," Exec. Sum. 11), including: (1) negotiating a lower price for the transaction in response to issues with receivables and other regulatory/accounting problems, (2) providing the bridge loan with high interest terms, favorable to Caterpillar, to accommodate Siwei's high growth rate, and (3) creating an earn-out system to be paid based on improved future profit by Siwei. Exec. Sum. 10-17. Such evidence hardly bolsters Plaintiffs' claim that Wunning and Oberhelman, in their thirst for Chinese market share, were steamrolling the Board into acting as a "mere rubber stamp" on the transaction. *See* Am. Compl. ¶¶ 51, 92–93.

Plaintiffs allege that the Board's failure to act in the face of worsening information about Siwei was an abdication of its fiduciary duties, Am. Compl. ¶ 48, but the facts, as alleged, show that the Board did consider this new information. The meeting minutes belie Plaintiffs' allegation that "[n]one of the[] questions" at the April 11, 2012 meeting "dealt specifically with Siwei." Am. Compl. ¶ 73. In addition to answering more general questions about Caterpillar's business interests in China at the half-day long meeting, Wunning and Oberhelman "engaged in a discussion *with members of the Board* concerning an announcement by Siwei that its revenues and earnings would be below earlier forecasts." Bd. Mtg Min. 4, Am. Compl. Ex. C, ECF No. 87-3 (emphasis added). Further, meeting on a regular basis to consider developments in the negotiation process shows that a board has "employ[ed] a rational process" and is an indication that a board has taken due care. *In re Lear Corp. S'holder Litig.*, 967 A.2d at 649. These facts do not create an inference that Defendants "completely and utterly failed to even attempt to meet their duties," *Dow*, 2010 WL 66769, at *10, nor do they suggest "intentional dereliction of duty" in bad faith, *Westmoreland*, 727 F.3d at 726.

Plaintiffs also allege that the existing due diligence process should have been more "thorough," Am. Compl. ¶ 35, and that the Board should not have proceeded "despite knowing that any positive information they had been provided concerning Siwei was unreliable, at best, or purposefully falsified, at worst." Pls.' Mem. Opp. 6. In support of this claim, they marshal the anonymous statement of a former board member, made to Reuters months after Siwei's accounting problems went public, that the deal "should have been investigated further." Am. Compl. ¶ 51. But "no matter how foolish the investment may appear in retrospect," *Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996), hindsight is not the measure of whether a board has acted in good faith. As the Court's previous Order noted:

> [w]hen a discrete transaction is under consideration, a board will always face the question of how much process should be devoted to that transaction given its overall importance in light of the myriad of other decisions the board must make. Seizing specific opportunities is an important business skill, and that involves some measure of risk.

Sept. 28, 2015 Order 17 (quoting *Lear*, 967 A.2d at 654).

Plaintiffs rely on *In re Tibco Software* to argue that the Caterpillar Board made a "conscious decision," in bad faith, to ignore information about Siwei's worsening outlook. Pls.' Mem. Opp. 15. That reliance is misguided. In *Tibco*, the Delaware Court of Chancery clearly explained that the defendant officers' failure to correct an error in a share count spreadsheet, resulting in a $100 million loss, followed by a failure to adequately inform themselves of the options or press for more information after discovery of the error, represented "at most" a breach of the duty of care under a gross negligence standard. *In re TIBCO Software Inc. Stockholders Litig.*, No. CV 10319-CB, 2015 WL 6155894, at *2, 23 (Del. Ch. Oct. 20, 2015). Plaintiffs allege that board members "did not ask specific questions" and "made no requests for additional information" or "for information on alternatives," Am. Compl. ¶ 91, but *Tibco* stands for the

proposition that even taken as true, such allegations could not rise to the level of bad faith.  *See id.*  And as previously discussed, the § 102(b)(7) exculpatory clause specifically protected the Caterpillar board from liability for negligence or gross negligence.

The most sizable addition to the Amended Complaint is the section of facts regarding the June 2011 SEC Investor Bulletin warning investors against purchasing certain types of Chinese stock due to filing discrepancies, Am. Compl. ¶¶ 88-90, but even when these facts are interpreted with all inferences in the Plaintiffs' favor, they do not create an inference of bad faith on the part of Caterpillar's directors.

First, the Bulletin was not directed at sophisticated corporate boards considering acquisition of Chinese companies, but rather to investors considering buying shares in private operating companies that had undergone reverse mergers (inapplicable to Siwei, a publicly traded company). Secondly, the generalized nature of the SEC's guidance—concerning several companies, none of which were Siwei or ERA—does not shed any further light on the actions or intentions of Caterpillar's directors regarding the decision to acquire Siwei. *See e.g. In re Discover Fin. Servs. Derivative Litig.*, No. 12 C 6436, 2015 WL 1399282, at *6 n.8 (N.D. Ill. Mar. 23, 2015) (noting that "[a]llegations about other companies and general industry regulation are insufficient to support an inference" that defendants were aware of deceptive practices within the company); *Brautigam v. Rubin,* 55 F. Supp. 3d 499, 506–507 (S.D.N.Y. 2014) (rejecting, as "red flags" sufficient to show that the Board consciously failed to respond to unlawful mortgage-servicing practices, general guidance issued by government agencies and industry-wide communications not specifically directed at the subject company).

The Court doubts whether the facts alleged in the latest Complaint could meet even the considerably lower standards of simple or gross negligence. *See Lear*, 967 A.2d at 649.  Thus,

the allegations in Plaintiffs' amended complaint do not raise a reasonable doubt that the

Caterpillar Board acted in a manner that was so irrational as to be a breach of the duty of loyalty

outside the bounds of the business judgment rule.

**B.  Corporate Waste**

The corporate waste doctrine is based on the fiduciary duty to protect corporate

resources, and acts as a "residual protection for stockholders that polices the outer boundaries of

the broad field of discretion afforded directors by the business judgment rule." *Sample v.

Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007).  Once a plaintiff has failed to rebut the business

judgment rule, his only remedy will come from showing that the transaction constituted waste.

*See In Re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006). Courts are ill-fitted to

weigh the adequacy of consideration and the appropriate degree of business risk taken by officers

and directors when assessing the transfer of corporate assets: where there was "*good faith

judgment* that the transaction was worthwhile" and "*any substantial* consideration" was received,

there should be no finding of waste. *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).

The Court previously noted the high bar a plaintiff must clear to excuse demand for a

corporate waste claim under *Aronson*. Order 18–19. To meet the pleading standard for waste

under Delaware law, a plaintiff must overcome the presumption of good faith by showing that

the board's decision was "so egregious or irrational that it could not have been based on a valid

assessment of the corporation's best interests." *In re Citigroup Inc. S'holder Derivative Litig.*,

964 A.2d 106,136 (Del. Ch. 2009) (quoting *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001)).

Accordingly, to excuse demand on grounds of a waste complaint, the plaintiff "must allege

particularized facts that lead to a reasonable inference that the director defendants authorized 'an

exchange that is so one sided that no business person of ordinary, sound judgment could

conclude that the corporation has received adequate consideration.'" *Citigroup*, 964 A.2d at 136

(quoting *Brehm*, 746 A.2d at 263). *See also Walt Disney*, 906 A.2d at 74 ("A claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets." (internal quotation marks omitted)).

Plaintiffs have not established demand futility as it pertains to the waste claim. Insofar as Plaintiffs' waste claim is rooted in the allegations that the Caterpillar Board acted as a "mere rubber stamp" in agreeing to go through with the Siwei acquisition, Am. Compl. ¶ 92-93, and therefore acted in bad faith, this set of facts fails to satisfy the standard for demand futility. In the foregoing analysis, this Court determined that the Caterpillar board did not act in bad faith and therefore did not act outside the bounds of the business judgment rule. It cannot be said that the directors squandered or gave away corporate assets where the board examined the value Siwei was expected to provide to Caterpillar, engaged with the possible shortcomings and risks of the transaction, and came to the reasoned conclusion that the acquisition was worth pursuing.

Plaintiffs' claim that Caterpillar received "insufficient consideration" for the acquisition, Pls.' Opp. 19, is based largely on an ex post facto assessment of Siwei's financial situation after the fraud allegations came to light. *Id.*; Am. Compl. ¶ 85-86. The alleged facts indicate that the Board thought it was making a strategic investment to capture market share in China by acquiring Siwei's manufacturing capabilities (including its existing physical plant and assets) and growing customer base. *See Citigroup*, 964 A.2d at 136. It can hardly be said that Caterpillar's actions were "so one sided" as to be irrational. *Id.*

In summary, Plaintiffs' Amended Consolidated Complaint does not sufficiently plead demand futility. This Court finds that the actions taken by the Caterpillar board in connection to the Siwei transaction were within the bounds of the business judgment rule, and did not indicate

an intentional dereliction of duty or action taken in bad faith. For these reasons, the Court grants Defendants' Motion to Dismiss.

### III.     Motion to Strike

Federal Rule of Civil Procedure 12(f) allows parties the opportunity to move to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f)(2). Plaintiffs have moved to strike, ECF No. 95, three exhibits attached to Defendants' Memorandum of Law in Support of their Motion to Dismiss including Exhibit A, a redlined comparison of the Consolidated Complaint and the Amended Complaint; Exhibit G, an excerpt from the Hong Kong Stock Exchange Consolidated GEM Listing Rules, and Exhibit I, the public SEC filings related to Caterpillar's tender offer of Siwei's parent company, ERA.  In the alternative, Plaintiffs request that if the Court considers these documents, Defendants' motion to dismiss be converted to a motion for summary judgment.

### A. Analysis

 "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Associates Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  A district court may "take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  A court may not, however, take judicial notice of a fact that is subject to reasonable dispute. *Id.* at 1081. *See* Fed. R. Evid. 201(b).  The exception for public records is "narrow," *Gen. Elec.*, 128 F.3d at 1080, but "allow[s] courts to avoid unnecessary proceedings" when facts on the public record indicate that the plaintiff cannot meet the pleading standard.   *Id.* at 1081.

Turning to the materials Plaintiff has moved to strike, it can hardly be said that the complaint itself is not "central" to the plaintiff's claim, and it is well established that the contents of court records are quintessential subjects of judicial notice. *Gen. Elec.*, 128 F.3d at 1081. Plaintiffs object to Defendants' characterization that the complaint contains "no new relevant factual information," Pls.' Mot. Strike 4, ECF No. 95; however, they do not contend that the redline is inaccurate, nor do they contend that the comparison offers anything beyond "facts readily ascertainable from the public court record and not subject to reasonable dispute," which are appropriate subjects of judicial notice. *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012). The redline is a visual representation of changes between the two documents, and does not present questions of evidentiary value. *Compare Gen. Elec.*, 128 F.3d at 1083 (taking judicial notice of a court's previous decision that a settlement was fair and reasonable—a conclusion which was reasonably in dispute—was subjective enough to raise questions as to the fairness of applying that previous finding to the current proceeding, and not appropriate for judicial notice). Therefore, the motion to strike Exhibit A is denied.

The Court did not draw any inferences from or rely on Exhibits G and I to reach its conclusion as to whether Plaintiffs successfully pled demand futility. For that reason, the Court declines, at this time, to engage in an in-depth analysis of whether these two exhibits are appropriate for judicial notice. *See Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *13 (N.D. Ill. Mar. 31, 2011).

### Conclusion

Plaintiffs' Motion for Leave to File Under Seal, ECF No. 92, is DENIED. Plaintiffs' Motion to Strike, ECF No. 95, is DENIED. Defendant's Motion to Dismiss, ECF No. 90, is

GRANTED, and Plaintiffs' Amended Consolidated Complaint, ECF No. 87, is dismissed with

prejudice.  The Clerk is directed to enter judgment and close the case.

ENTERED September 29, 2016

_____
s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
